Leland Dean POINDEXTER, Plaintiff,

v.

Otis R. BOWEN, Secretary of Health
and Human Services, Defendant.

No. C86–0259J.

United States District Court,
D. Wyoming.

Feb. 19, 1988.

Elaine Bodurtha, Wind River Legal Services, Inc., Fort Washakie, Wyo., for plaintiff.

Carol A. Statkus, U.S. Atty., Cheyenne, Wyo., for defendant.

## MEMORANDUM AND ORDER REVERSING FINAL DECISION OF THE SECRETARY

JOHNSON, District Judge.

### I. BACKGROUND

On 7 June 1985, Leland Poindexter applied for social security disability benefits. His application was denied on 18 July 1985; after reconsideration the application was again denied on 17 September 1985. A 22 November 1985 administrative hearing resulted in a 4 April 1986 decision denying benefits. This became the Secretary's final decision on 16 June 1986 when the Social Security Appeals Council denied review. On 28 July 1986 the present action was filed. The requirements of 42 U.S.C. § 405(g) have been met, and this court has jurisdiction to hear the appeal.

## II. EVIDENCE DISCLOSED IN THE RECORD

Leland Poindexter was born on 23 April 1953. He has earned a GED but has no formal training in any field. (R.A., p. 42) He has worked as a floor hand, laborer, construction worker, and oil field worker. (R.A., p. 95) Leland Poindexter's problems began on 22 March 1980 when he slipped while standing on heavy machinery and fell five feet to the ground. Because of the pain caused by his fall, he was taken to the Sweetwater Memorial Hospital emergency room and evaluated by Dr. Joe Oliver, who, after films were taken, began conservative treatment. (R.A., p. 120) He apparently had no significant improvement in his lower back, buttocks, and thigh pain, and in April 1980, he was taken to the University of Utah Medical Center in Salt Lake City.

On 16 April 1980, Dr. M. Peter Heilbrun examined Leland Poindexter at the University Hospital. His general physical examination of the back revealed a moderate paraspinous muscle spasm with limitation of motion on forward flexation. Straight leg raising was limited on the right. The neurological examination revealed no weakness or sensory deficit. Dr. Heilbrun's impression was of root compression secondary to spondylolisthesis.[1] He advised two more weeks of rest, but if no improvement was made, he felt that fusion and decompression[2] may be indicated. (R.A., pp. 120–21)

On 4 May 1980, Leland Poindexter was again admitted to the University Hospital, his chief complaint being low back pain. Dr. Heilbrun described the history of present illness as severe lumbrosacral and right anterior thigh pain and recent left buttocks pain all resulting from the fall. The doctor noted that "the pain has decreased somewhat with rest and increased with sitting, standing or walking for short distances." (R.A., p. 118) The general physical examination revealed decreased lumbar lordosis[3] without spasm or lift, L5 percussion tenderness without any sciatic notch tenderness, markedly limited flexion and extension of the lumbar spine secondary to pain, and an unremarkable neurologic exam except for diminished but present ankle jerks bilaterally. (R.A., p. 118) On 7 May 1980, Dr. Heilbrun performed an L5 laminectomy[4] and L5/S1 transverse process fusion on Leland Poindexter. On 13 May 1980 he was discharged with a lumbar corset brace and instructions to return to neurosurgery clinic as directed. (R.A., pp. 118–19)

After initially improving, on 9 November 1980 Leland Poindexter again was admitted to the University Hospital complaining of pain in the left posterial lateral thigh with left low back pain. The next day a lumbar metrizamide myelogram was performed, which showed Grade I to II spondylolistheses of L5–S1 not significantly changed since May 1980. Dr. Heilbrun's final clinical impression was of low back pain and possible radiculopathy following L5–S1 laminectomy and fusion. The disposition was for Leland Poindexter to be followed in neurosurgery and pain clinics. (R.A., pp. 125–26)

On 11 November 1980, Dr. S.D. Wing compared the May and November myelograms.[5] He found no significant change in the Grade I to II spondylolistheses of L5 on

---

1. "[F]orward displacement of a vertebra over a lower segment, usually of the fifth lumbar over the sacrum, or of the fourth lumbar over the fifth." B. Miller & C. Keane, *Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health,* 946 (2d Ed.1978).

2. "[R]eturn to normal environmental pressure after exposure to greatly increased pressure." *Id.* at 272.

3. "[F]orward curvature of the lumbar spine." *Id.* at 588.

4. "[S]urgical excision of the posterior arch of the vertebra. The procedure is most often performed to relieve the symptoms of a ruptured intervertebral disk (slipped disk). When several disks are involved, spinal fusion may be done so that the vertebrae in the affected area will remain in a fixed position. Bone grafts, usually taken from the iliac crest, are applied to fuse the affected vertebrae permanently, resulting in limitation of movement of this portion of the spine." *Id.* at 564.

5. "The film produced by myelography." Myelography is "roentgenography of the spinal cord after injection of a contrast medium into the subarachnoid space." *Id.* at 661–62.

S1, but concluded that the lower lumbar fusion may not be intact, noting an apparent cleft at L5–S1 on the scout film. (R.A., p. 132) On 21 November 1980 Leland Poindexter was discharged.

On 10 March 1981 Leland Poindexter was admitted to the University Hospital, again complaining of low back pain and leg pain. He described this pain as somewhat aggravated by activity but generally constant even when he is at rest. Dr. H.K. Dunn, the attending physician, found that x-rays suggested a pseudarthrosis,[6] diffuse[7] mass[8] from L5 to S1 and admitted Leland Poindexter for refusion at the lumbrosacral level. (R.A., p. 133)

On 11 March 1981 surgery was performed and the fusion mass explored. Although the fusion mass was solid, there were degenerative changes at the facet between L4 and L5. Therefore the fusion mass was extended up to include L4. On 17 March 1981, Leland Poindexter was discharged with instructions that he be limited to strict bed rest and that he wear his back brace 23 hours a day. (R.A., pp. 133–34)

After about eight months spent recovering, Leland Poindexter went back to construction work. He felt pretty good for about six or seven months, but then the back pain returned. He obtained medication and continued working, but the pain grew worse until in September 1983, he was unable to work. (R.A., pp. 46–47)

On 14 October 1983, Leland Poindexter sought treatment from a local doctor, John A. Whipp, who has continued to treat him. Over the next 11 months, Dr. Whipp diagnosed Leland Poindexter's condition with lumbar myelogram and CT scans and treated him with candral epidural steroid injection. Having obtained no positive results, on 23 September 1984, Leland Poindexter was admitted to the Lander Valley Regional Medical Center for reexploration of his lumbar fusion. (R.A., p. 147)

The general physical examination preceding the surgery revealed that when Leland Poindexter stood, his lumbar muscles were tight and he placed his back in a hyperextended position. Dr. Charles Allen also observed some limited motion in the lumbar spine as seen from his inability to flex past sixty degrees. Straight leg raising caused no pain. Dr. Allen's diagnosis was of chronic lower back pain. (R.A., pp. 147–48)

Dr. Whipp performed the surgery and described it as follows: "Take down of fusion posteriorly on the right with deroofing of both the fusion mass and a rather extensive laminectomy to remove the spinal stenotic and lateral recess areas." The final diagnosis was "[e]ntrapment of nerve with scar tissue and early spinal stenosis[9] from a lateral recess syndrome." (R.A., p. 146) On 2 October 1984, Leland Poindexter was discharged, having undergone his third back operation.

On 11 October 1984 Leland Poindexter notified Dr. Allen that his wound was open and draining pus. On 12 October 1984 Leland Poindexter was readmitted to the hospital and cultures of the wound drainage were performed and intravenous antibiotics were administered. Because of an illness in his wife's family, Leland Poindexter, against medical advice, signed out of the hospital the next day. He was advised to continue his oral antibiotics and to clean his wound daily with hydrogen peroxide. (R.A., p. 144)

At his hearing, Leland Poindexter testified that his back began to feel better about three months after the surgery; this continued for about two months when his back started acting up again. He attended a chronic pain clinic at the University of Utah Medical Center in the summer of 1984. He stayed for only half of the four-week program because he felt it was not working for him. (R.A., pp. 181–82) After his doctor had told him that he could not go back to work, he enrolled at Western Wyo-

---

6. "[A] pathological entity characterized by deossification of a weight-bearing long bone, followed by bending and pathologic fracture, with inability to form normal callus leading to existence of the 'false joint' that gives the condition its name." *Id.* at 835.

7. "[N]ot definitely limited or localized." *Id.* at 294.

8. "[A] lump or collection of cohering particles." *Id.* at 604.

9. Stenosis is a "narrowing or contraction of a body passage or opening." *Id.* at 954.

ming Community College in January 1985 for training as a medical lab technician. (R.A., p. 48) He went full-time his first semester, took one course in the summer, and enrolled for twelve hours in the fall. It was then, he says, that his back pain would have caused him to miss more than the allowed number of classes, so he withdrew. (R.A., pp. 55–57)

At the close of the hearing, the ALJ decided to have Leland Poindexter examined by a psychologist. (R.A., p. 71) On 13 January 1986, Dr. Larry J. Carlson released a confidential psychological evaluation of Leland Poindexter. This report states that both the MMPI and WAIS–R tests were administered and that "individuals obtaining similar profiles are quite depressed and constricted. They tend to be overcontrolled and inhibited by feelings of self-doubt and inadequacy, apathetic lack of interest, and general tension." (R.A., p. 183) Dr. Carlson further noted that "Mr. Poindexter has a personality make-up that would predispose him to the development of psychogenic pain disorder but history suggests that a physical condition (injury) precipitated his back problem." (R.A., p. 185)

On 4 April 1986 the ALJ denied social security disability income benefits. The main issue before the court, with other issues subsumed by it, is whether substantial evidence supports the ALJ's decision.

## III. SUBSTANTIAL EVIDENCE

### A. Introduction

The Secretary's decision on the issue of disability will be affirmed if it is supported by substantial evidence. *Nieto v. Heckler,* 750 F.2d 59, 61 (10th Cir.1984). Substantial evidence is more than a mere scintilla, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Turner v. Heckler,* 754 F.2d 326, 328 (10th Cir.1985) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). This limited standard of review does not apply to questions of law. "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir. 1984) (quoting *Smith v. Heckler,* 707 F.2d 1284 (11th Cir.1983)).

In denying income disability benefits to Leland Poindexter, the ALJ relied on the five-step evaluation of disability as contained in the regulations. 20 C.F.R. § 404.1520 Proceeding through the first four steps, the ALJ made the following findings concerning Leland Poindexter: 1) He was not engaging in substantial gainful activity; 2) He had both physical and psychological severe impairments; 3) He did not have an impairment that constituted a disability per se; [10] and 4) He was not capable of doing past work. The ALJ denied benefits based on the fifth step, namely, that the Secretary had shown that he could do other work.

The claimant has the burden of proving that he is disabled under the Social Security Act.[11] 42 U.S.C. § 423(d)(5). Once a

---

10. Leland Poindexter does not claim on appeal that he suffers from an impairment qualifying as disability per se under 20 C.F.R. 404, Subpart P, Appendix 1. Therefore, this court will not examine the ALJ's findings that no such impairment existed.

11. The statute in relevant part defines disability as follows:

An individual (except a widow, surviving divorced wife, widower, or surviving divorced husband for purposes of section 202(e) or (f) [42 U.S.C.S. § 402(e) or (f)]) shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where the individual lives or in several regions of the country.

disability is shown that prevents previous work activity, the burden shifts to the Secretary to show "that the claimant retains the capacity to perform an alternate work activity and that this specific type of job exists in the national economy." *Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir.1987) (quoting *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir.1984)). If the Secretary does not meet this burden, the claimant is disabled for purposes of award of disability benefits. *Frey,* 816 F.2d at 512.

### B. Pain as a Disability

Leland Poindexter's chief claim for disability benefits concerns his back pain.[12] The ALJ found that the claimed pain did not qualify him for benefits, stating that "[t]he claimant's subjective complaints of inability to tolerate considerable sitting interspersed with occasional standing and walking because of pain and other physical limitations are not supported by the objective clinical findings, laboratory test results, or the totality of the evidence and are not found to be credible." (R.A., p. 19) Leland Poindexter claims that the ALJ applied an improper standard for disabling pain.

The proper standard for evaluating pain as a disability is contained in the statute, which provides in relevant part, as follows:

An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical evidence and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

42 U.S.C. § 423(d)(5)(A). This language has recently been interpreted by the Tenth Circuit.

In *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987), the court construed "could reasonably be expected to produce the pain" to require a nexus between a pain-producing impairment and the pain alleged. *Id.* at 163. The court decided that congressional intent required only a loose nexus. *Id.* at 164. As an example of the loose nexus, the court noted that "an impairment likely to produce *some* back pain may reasonably be expected to produce *severe* back pain in a particular claimant." *Id.* (Emphasis in original). In cases involving such a nexus, the court noted, the decision-maker must consider all evidence presented to determine whether the claimant's pain is disabling. This evidence includes "medical evidence previously presented, any other objective indications of the degree of pain, and subjective accounts of the severity of the claimant's pain." *Id.* at 163. After having considered these factors, the decision-maker may then decide whether he believes the claimant's assertions of severe pain. *Id.*

In this case the ALJ followed the above procedures and hence applied the correct standard on disabling pain. His reference to "the totality of the evidence" indicates that he did not rely exclusively on objective results of diagnostic tests, which would have been error. *Nieto v. Heckler,* 750 F.2d 59, 61 (10th Cir.1984). His decision is next attacked, and will now be reviewed, as to whether substantial evidence

---

**12.** The back pain impairment involves both physiological and psychological aspects. In addition, Leland Poindexter also lists as impairments hearing loss in one ear and a knee that once required surgery. The Secretary must consider the combined effect of all impairments in evaluating whether they are severe enough to qualify for benefits. 42 U.S.C. § 423(d)(2)(C).

supports it. This requires examining the medical evidence and the credibility of the subjective accounts of pain.

██ No one can know the severity of pain that another suffers. Even so, many factors have developed to evaluate the credibility of subjective claims of severe pain. Both the Tenth Circuit and the Secretary himself have noted factors that aid in determining credibility. This court now analyzes these factors in terms of Leland Poindexter's situation.

The first factor cited by the Tenth Circuit concerns "a claimant's persistent attempts to find relief for his pain and his willingness to try any treatment prescribed." *Luna,* 834 F.2d at 165. In an effort to stop his pain, Leland Poindexter has undergone myelograms, three back operations, steroid injections, and CT scans. Each time his pain returned, requiring his return for medical treatment. His willingness to undergo such procedures can only add credibility to his accounts of pain.

The second factor cited by the Tenth Circuit concerns a claimant's "regular contact with a doctor." *Id.* at 166. The record reveals such regular contact from the date of injury onward. Again this adds credibility to Leland Poindexter's claims of pain.

The third factor cited by the Tenth Circuit concerns "the possibility that psychological disorders combine with physical problems." *Id.* (citing *Turner,* 754 F.2d at 331; *Nieto,* 750 F.2d at 62). Dr. Carlson, the ALJ-appointed psychologist, evaluated Leland Poindexter and concluded as follows:

> Mr. Poindexter has a personality makeup that would predispose him to the development of psychogenic pain disorder but history suggests that a physical condition (injury) precipitated his back problem. Resulting MMPI profile makes him a high risk individual for successful back surgery. Such individuals are also predisposed to learn helplessness, particularly when physical injury and increased psychosocial stressers are present.

Again this adds credibility to Leland Poindexter's complaints of pain.

One factor cited by the Secretary concerns "the claimant's daily activities." *Luna,* 834 F.2d at 166. At his hearing, Leland Poindexter testified that he could stand for up to an hour and sit for twenty to thirty minutes before pulsating pain in his back intensified. (R.A., pp. 50–51) Because the pain is best alleviated by lying down, he lies down all day unless there is something he has to do. (R.A., p. 52) He can bathe himself and cook items such as soup. (R.A., pp. 52–53) His evenings are also spent lying down at home. (R.A., p. 55) These limited activities add credibility to his accounts of pain.

Another factor cited by the Secretary concerns the claimant's "dosage, effectiveness, and side effects of medication." *Id.* The ALJ recognized that Leland Poindexter used such medicines as Darvoset–N, Meclomen, and Feldene throughout 1984 and 1985. (R.A., p. 17) The doctors' continuous prescriptions of pain killers and Leland Poindexter's continuous use of them add credibility to his subjective accounts of pain.

In determining that Leland Poindexter's accounts of disabling pain are credible, this court considers one last factor. Before his injury, Leland Poindexter was a productive member of society. During the periods after his operations when he felt some relief from his pain he returned to work and later to school until the pain returned and became too great. His history is of willingness to work if able.

Based on the three back operations and the results from the above factors, this court finds Leland Poindexter's subjective accounts of pain credible. As is spelled out later in this opinion, the medical evidence supports this view.

## C. Erroneous Application of the Grids: Conclusive Use of the Grids on a Nonexertional Impairment

As previously stated, this case came down to the fifth step of the Secretary's five-step evaluation process. At the fifth step it is conceded that a claimant cannot do past work. The Secretary then bears the burden of showing that the claimant can perform other work available in the national economy. *Gatson v. Bowen,* 838 F.2d 442, 446 (10th Cir.1988). The Secre-

tary can often meet this burden by relying on the Medical Vocational Guidelines, known as the "grids." 20 C.F.R. 404, Subpart P, Appendix 2. The grids contain two categories that allow presumptions to be made of disability or ability. The first category is the claimant's residual functional capacity (RFC) to perform work, whether sedentary, light, medium, heavy, or very heavy. This RFC represents the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs. 20 C.F.R. 404, Subpart P, Appendix 2, § 200.00(c). The second category is the claimant's vocational factors, namely, his age, education, and work experience.

■ The disability determination hinges in part on whether the claimant can perform "work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Secretary promulgated the grids in 1978 to assist in making the disability determination. *Channel v. Heckler,* 747 F.2d 577, 578 (10th Cir.1984). The grids allow the Secretary to take administrative notice of the number of jobs that exist in the national economy at the various functional levels. *Id.* at 579; 20 C.F.R. 404, Subpart P, Appendix 2 § 200.00(b). In effect this alleviates the need for vocational experts except in situations in which a claimant does not fit the grids and additional evidence is necessary. *Talbot v. Heckler,* 814 F.2d 1456, 1460 (10th Cir.1987) (citing *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)).

■ The grids may not be applied conclusively unless a claimant's characteristics precisely match the criteria of a particular rule. *Frey v. Bowen,* 816 F.2d at 512. The grids take into account only exertional or strength impairments. They cannot be used where a nonexertional impairment

such as pain limits a claimant's ability to perform a full range of work. *See, e.g., Harris v. Secretary of Health and Human Services,* 821 F.2d 541, 545 (10th Cir.1987); *Frey,* 816 F.2d at 513 (quoting *Teter,* 775 F.2d at 1105); *Turner,* 754 F.2d at 331; *Channel,* 747 F.2d at 580. Pain is a sensory limitation. *Wilson v. Heckler,* 743 F.2d 218, 222 (4th Cir.1984). Sensory limitations are nonexertional in that they do not relate to the strength requirements of jobs. 20 C.F.R. 404, Subpart P, Appendix 2 § 200.00(e).

■ Pain is an exertional impairment to the extent that it arises from such physical activities as walking, standing, lifting, carrying, pushing, pulling, reaching, and handling. These activities relate to the strength requirements of the grids' RFC ranges. Pain is a nonexertional impairment when it exists whether or not a claimant is exerting himself in such physical activities.[13] For example, pain suffered while sitting or lying seems to be primarily nonexertional in character. *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988). Leland Poindexter is in pain whether at work or not; his pain does not stem from overexertion. Therefore his back pain, as well as his psychological disorder, is a nonexertional impairment, and the grids cannot direct a conclusion on the disability question. The ALJ erred when he said otherwise.

D. Erroneous Application of the Grids: The Secretary's Failure to Fulfill its Burden to Show that Claimant Can Perform a Full Range of Sedentary Work

Because Leland Poindexter cannot perform his past work, the Secretary must show that he can perform a full range of work at a residual functional capacity level.

---

**13.** The Secretary refers the court to 43 Fed.Reg. 55349, 55358 (1978) at which he expresses the view that "pain and other symptoms are constituents of an impairment, not impairments by themselves, and are given recognition in Tables No. 1, 2, and 3 in Appendix 2, as elements of residual functional capacity when the impairment with which they are associated is one that limits exertional capability to sedentary, light, or medium work." As mentioned, Leland Poindexter's pain is a nonexertional impairment un-

der Tenth Circuit law. Even if his pain were purely exertional, the grids still would not defeat his claim for benefits. The Secretary must prove that Leland Poindexter can perform a full range of sedentary work before the grids can direct a conclusion as to disability. In doing so, the Secretary must show that pain does not substantially diminish Leland Poindexter's ability to so perform. *Gatson v. Bowen,* 838 F.2d 442, 448 (10th Cir.1988). The Secretary has not met his burdens.

20 C.F.R. § 404.1520(f). "To be placed at a particular level of residual functional capacity, 'a claimant must be able to perform the *full range* of such work on a daily basis.'" *Frey*, 816 F.2d at 512–13 (citing *Channel*, 747 F.2d at 579) (emphasis in original). This requires "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *See Talbot*, 814 F.2d at 1464.

The ALJ examined the medical evidence in the record (both physiological and psychological) and concluded that Leland Poindexter had the ability to perform a full range of sedentary work. This court must now decide whether substantial evidence supports this decision.

Sedentary work represents a significantly restricted range of work, but not so prohibitively restricted as to negate work capability for substantial gainful activity. 20 C.F.R. 404, Subpart P, Appendix 2 § 201.00(b). Sedentary work is generally defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. section 404.1567(a). This same section more specifically defines sedentary work by referring to the definition provided in the Dictionary of Occupational Titles, as published by the Department of Labor. That definition provides as follows:

Sedentary work implies a capacity to sit for at least 6 hours in an 8–hour day and to lift up to 10 pounds maximum. The ability to walk and stand up to approximately one-third of the work day (2–3 hours per 8–hour day) is also implied in sedentary work.[14]

Dictionary of Occupational Titles, *Occupational Classification* Vol. II (3d Ed.1965). *See Wilson*, 743 F.2d at 221. Substantial evidence must satisfy the conditions imposed by these definitions.

■ The ALJ first based his decision on the responses made by Dr. John A. Whipp to a form assessing Leland Poindexter's residual functional capacity. In that form, Dr. Whipp found that Leland Poindexter's basic strength factors were limited. Questions as to Leland Poindexter's ability to stand and/or walk and to sit provided two boxes that could be checked. The first box was for less than about six hours and the second box was for about six hours (per eight-hour day). The question as to standing and walking asked for an explanation if there were a marked limitation; the question about sitting did not. (R.A., p. 173) Dr. Whipp checked boxes indicating less than six hours but provided no further explanation. About three weeks later, Dr. Whipp added that the time sitting could be considerably improved if Leland Poindexter were allowed to do what his own symptoms dictated, meaning that he could rotate sitting, standing, and walking as necessary. (R.A., p. 179) From these statements, the ALJ erroneously attributed to the doctor a finding that Leland Poindexter could sit longer than six hours if occasional standing and walking were permitted. (R.A., p. 18) Not only did the doctor not say that, he did not state that Leland Poindexter could sit anywhere near six hours even with occasional standing and walking.

---

**14.** Another definition has been provided after Leland Poindexter's hearing. "Sedentary Work—Exerting up to 10 pounds of force occasionally [activity or condition exists up to ⅓ of the time], and/or up to 10 pounds of force frequently [activity or condition exists from ⅓ to ⅔ of the time] or constantly [activity or condition exists ⅔ or more of the time] to lift, carry, push, pull, or otherwise move objects including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary requirements are met." Dictionary of Occupational Titles, *Rating Structures of Physical Demands and Environmental Conditions*, p. 101 (Supp. 4th Ed.1986). Both definitions contemplate extensive sitting beyond Leland Poindexter's capabilities.

In deciding whether substantial evidence supports an ALJ's decision, the court must consider all detracting evidence in the entire record. *Neito v. Heckler*, 750 F.2d 59, 61 (10th Cir.1984). In response to a question in the form inquiring about Leland Poindexter's ability to push and/or pull (including hand or foot controls), Dr. Whipp found a limited ability. Dr. Whipp described the limitation as the sitting factor and further noted that a "marked amount of force would be ill advised and any specific positional strain would also be very ill advised." (R.A., p. 179) Dr. Whipp then described Leland Poindexter's pain as disabling since "[h]e is rather verbal about what causes him problems and what he can get by with and I think he does have significant problems associated with his low back which limit specifically what he can do." In discussing medication prescribed, Dr. Whipp noted that "[i]n people with chronic low back pain, as you probably know, addiction is a real problem and we are trying to circumvent this." (R.A., p. 179)

The ALJ next addressed Leland Poindexter's mental condition as spelled out in Dr. Larry Carlson's report. In determining whether a claimant's mental disorders are severe, four areas must be evaluated. 20 C.F.R. § 404.1520a(b)(3). The first area concerns whether the claimant has significant restriction of daily activities. In a 10 February 1986 response to an interrogatory, Dr. Carlson stated that Leland Poindexter had a marked restriction of activities of daily living. The ALJ did not accept this assessment because the "yes" or "no" question did not provide sufficient scale. The ALJ also rejected Dr. Carlson's conclusion because it was unsupported by appropriate findings. The ALJ concluded that there was at most a moderate restriction of the activities of daily living. (R.A., p. 12)

The second area for evaluation concerns difficulties in maintaining social functioning. In response to the "yes" or "no" interrogatory, Dr. Carlson again concluded that there was a marked difficulty in this area. The ALJ rejected this conclusion on grounds of Dr. Carlson's specific findings and the ease with which Leland Poindexter interacted with Dr. Carlson. The ALJ con-cluded that Leland Poindexter at most is moderately impaired in his social functioning. (R.A., p. 12)

The third area concerns deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. In response to the interrogatory, Dr. Carlson stated that there were such deficiencies and that "[h]is reported pain clearly has, by history, affected his pace and persistence of work settings." (R.A., p. 189) The ALJ relied on Leland Poindexter's performance during the testing procedure to conclude that he seldom or never shows significant deficiencies of concentration, persistence, or pace in failing to complete tasks. (R.A., p. 13)

The fourth area concerns any episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms. Relying on Leland Poindexter's report, Dr. Carlson concluded that such repeated episodes had occurred. The ALJ disagreed on the basis that no such episodes were revealed in the doctor's report or the record. The ALJ therefore concluded that Leland Poindexter never had shown episodes of deterioration or decompensation in work or work-like settings. (R.A., p. 13)

From his above conclusions, Dr. Carlson decided that Leland Poindexter was not then capable of substantial gainful employment. This conclusion was based on "[h]is psychological makeup, attitude toward his ability to work, and his reported level of disabling pain...." (R.A., p. 189) Even taking the ALJ's conclusions over those of Dr. Carlson, the two moderate limitations qualify Leland Poindexter's mental impairments as severe under 20 C.F.R. § 404.1520a. (R.A., p. 13) The ALJ declared that the mental impairments specifically preclude Leland Poindexter "only from engaging in work that emphasizes constant dealing with the public or constant interpersonal interaction with co-workers." (R.A., p. 18) Nothing, in the ALJ's view, significantly compromised Le-

land Poindexter's capacity to perform an "essentially full range of 'sedentary' work."

As mentioned, the Secretary has the burden to prove a claimant may perform a full range of work in a residual functional capacity level. The Secretary offered no vocational expert to testify that one with Leland Poindexter's conditions could so perform. Substantial evidence requires more than an ALJ's hunch that work is available in the national economy.

## IV. CONCLUSION

Substantial evidence is lacking to support the ALJ's findings that Leland Poindexter did not suffer disabling pain and that he was capable of a full range of sedentary work. The ALJ erred in conclusively applying the grids to the nonexertional impairment of pain. The only conclusion in the record supported by substantial evidence is that Leland Poindexter has been disabled from 25 September 1983.

This court has "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand for further fact-finding would serve no useful purpose since the Secretary did not meet his burden to show that Leland Poindexter could do sedentary work that existed in the national economy, and substantial evidence exists that Leland Poindexter could not so perform. *See Harris*, 821 F.2d at 545. This court, for the above reasons, ORDERS that the Secretary's final decision adverse to the plaintiff is reversed, and the case remanded to the Secretary for the calculation and award of benefits.